[Cite as *State v. Hockett*, 2011-Ohio-2911.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 95232

---

# STATE OF OHIO

## PLAINTIFF-APPELLEE

### vs.

# MAURICE C. HOCKETT

## DEFENDANT-APPELLANT

---

## JUDGMENT:
## AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case Nos. CR-518448 and CR-519602

**BEFORE:**    Sweeney, J., Boyle, P.J., and Keough, J.

**RELEASED AND JOURNALIZED:**    June 16, 2011

**ATTORNEY FOR APPELLANT**

Ronald Skingle, Esq.
2450 St. Clair Avenue
Cleveland, Ohio 44114

**ATTORNEYS FOR APPELLEE**

William D. Mason, Esq.
Cuyahoga County Prosecutor
By: Katherine Mullin, Esq.
Assistant County Prosecutor
The Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

JAMES J. SWEENEY, J.:

{¶ 1}  Defendant-appellant Maurice C. Hockett appeals his convictions for felonious assault, domestic violence, and two counts of child endangerment as being based upon insufficient evidence. For the reasons that follow, we affirm.

{¶ 2}  Defendant was indicted in various cases with multiple count indictments, which were consolidated for trial. The charges arose from injuries suffered by defendant's four month old daughter, N.C.H. The offenses were alleged to have occurred between November 1, 2008 and November 24, 2008. N.C.H.'s mother, Sharday Clapton, was also charged as a

co-defendant in one case. Defendant moved for acquittal on all counts. In CR-518448, the jury found defendant guilty of child endangering in violation of R.C. 2919.22(A) with an additional finding that the victim was under eighteen years of age. In CR-519602, the jury found defendant guilty of felonious assault in violation of R.C. 2903.11(A)(1); two counts of child endangering in violation of R.C. 2919.22(A) and 2919.22(B)(1), with an additional finding that the victim was under the eighteen years of age; and domestic violence in violation of R.C. 2919.25(A).

{¶ 3} Defendant's sole assignment of error relates to his convictions in CR-519602 only, and he contends:

{¶ 4} "Appellant's four convictions of felonious assault, endangering children in violation of R.C. 2919.22(A) and (B)(1) and domestic violence in Case No. CR-519602 are not supported by sufficient evidence."

{¶ 5} An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541.

**{¶ 6}** Defendant was charged with felonious assault in violation of R.C. 2903.11(A)(1), which provides: "(A) No person shall knowingly * * * [c]ause serious physical harm to another or to another's unborn;"

**{¶ 7}** He was also charged with child endangering pursuant to R.C. 2919.22(A) and (B)(1), which provides:

**{¶ 8}** "(A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. It is not a violation of a duty of care, protection, or support under this division when the parent, guardian, custodian, or person having custody or control of a child treats the physical or mental illness or defect of the child by spiritual means through prayer alone, in accordance with the tenets of a recognized religious body.

**{¶ 9}** "(B) No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:

**{¶ 10}** "(1) Abuse the child."

**{¶ 11}** Defendant's final conviction was for domestic violence as set forth in R.C. 2919.25(A) as follows: "No person shall knowingly cause or attempt to cause physical harm to a family or household member."

{¶ 12} These charges related to injuries sustained by defendant's daughter, including a subdural hematoma. The indictment charged that the offenses occurred between November 1, 2008 and November 24, 2008, the day she was admitted to the hospital due to concerns over her low weight.

{¶ 13} Defendant asserts that there was insufficient evidence to establish that he knowingly caused serious physical harm or physical harm to his daughter and that he recklessly abused or violated a duty to protect her from abuse. He premises his argument on the fact that various individuals participated in the care of N.C.H. and an absence of direct evidence that he inflicted any of the injuries that were suffered by his four month old daughter, which included failure to thrive, a fractured wrist, chronic subdural hematomas caused by "non-accidental trauma, inflicted trauma, or shaken baby syndrome," and retinal hemorrhages.

{¶ 14} A social worker from Cuyahoga County Department of Children and Family Services testified to her involvement with N.C.H. that began on April 29, 2008. She testified that defendant and Clopton turned down offered assistance for both N.C.H. and her older brother. They also refused five referrals for in-home nursing assistance.

{¶ 15} Another social worker, Holly Williams, testified concerning the agency's efforts concerning the care and custody of N.C.H. and her older brother who had been removed from the home. Williams testified that

defendant had threatened her and refused her entry during an attempted home visit. Williams said that defendant stated he would "harm me, he would shoot me, he would bomb the agency." The parents also canceled several home visits and failed to take N.C.H. to scheduled medical appointments despite an on-going concern over the infant's low weight. Williams testified that defendant took N.C.H. to some medical appointments, which were required once a month. However, he indicated that the appointment was not conducive to his work schedule. Efforts were made to accommodate defendant's schedule but he still failed to bring N.C.H. back for the appointment.

{¶ 16} After three or four home visits were canceled, Williams attempted to facilitate a visit by coordinating a sibling visit between N.C.H. and her brother at the hospital. By this time, N.C.H. was "extremely, extremely tiny and looked the size of a newborn." Williams and others were able to convince Clopton to take N.C.H. to the emergency room where she was admitted with concerns regarding her weight.

{¶ 17} Defendant asserts that the evidence is insufficient that it was him who caused these injuries to N.C.H. Defendant points to the witnesses' inability to identify how N.C.H. had sustained the injuries, exactly when she sustained them, and who caused them.

{¶ 18} As set forth above, there is sufficient testimony that N.C.H.

suffered a fractured wrist and head injuries within weeks prior to being admitted to the hospital. There is also evidence that defendant and the co-defendant were the ones who took care of her. There is direct evidence that N.C.H was obviously underweight yet defendant failed to take her to scheduled appointments. That she gained weight without a problem when properly fed indicates that her caretakers, which were defendant and the co-defendant, were not properly feeding her. Both caretakers were indicted in the case at bar.

{¶ 19} We note that defendant is not challenging his conviction for child endangering that stemmed from the incident at that occurred at the hospital. However, the evidence is probative of how defendant handled and treated N.C.H.

{¶ 20} Defendant simply ignores his erratic behavior at the hospital, where multiple witnesses observed him handling the child in a rough and unsafe manner. These facts alone distinguish this case from those at issue in *State v. Miley* (1996), 114 Ohio App.3d 738, 684 N.E.2d 102, upon which defendant relies. See, also, *State v. Cheney-Shaw*, Cuyahoga App. Nos. 76828 and 76829.[1] Witnesses observed defendant squeezing the baby harder

---

[1]Further, the injuries at issue in *Miley* were internal without any external manifestations. Here, while there were internal injuries, there also was an on-going concern over the child's low weight in spite of which defendant failed to attend some scheduled appointments.

and harder causing her eyes to bulge; ramming into doors at full force while holding the baby and without properly supporting her head.

{¶ 21} A few hours after N.C.H. had been admitted to the hospital on November 24, 2008, defendant entered her hospital room. Nurses at Rainbow Babies and Children Hospital testified that they heard a commotion and saw defendant running out of the room with N.C.H. in his arms. He "ran through the nurses station, jumped over the reception desk * * * and was holding the baby. He tried to ram his body into the locked double doors to try to escape* * *." Security was called because of defendant's behavior and the danger it posed to the baby including that "he tried to ram through double doors holding an infant in his arms." It was possible that the baby could have touched the double doors as he was ramming forward into them. Other witnesses described defendant ramming the door with his shoulder with full force while holding the baby.

{¶ 22} The baby's head was draped over defendant's arm and he was not supporting it. Clopton asked defendant to give her the baby but he refused. Defendant was handling N.C.H. roughly, "her head was not being supported." A nurse told defendant to support the baby's head and defendant responded by yelling obscenities and hitting the nurse. A few times defendant said, "I'm her protection and she's mine."

{¶ 23} When nurses approached and attempted to take the baby from

him for safety, defendant yelled, "F*** you. Who are you to be telling me about my child." Nurses and aids continued their efforts to obtain the baby "so she would be safe." Their primary concern was for the safety of the child. One of the nurses was reaching for the baby saying, "Please give me the child so she can be safe" and defendant slapped her.

{¶ 24} Security guards arrived with pepper spray. As security was trying to take the baby, defendant was struggling "whipping his body around and her head is just going around." The nurse was very nervous for the baby, "how she was being handled." A security guard observed defendant continuously squeezing the baby hard. Defendant said at one point, "You are making me hurt her. You are making me hurt her," and he would keep squeezing her harder. According to the guard defendant "keeps squeezing the child harder and harder. Her eyes are starting to bulge from her head * * * When he's squeezing her, her eyes were bulging out of her head."

{¶ 25} Clopton jumped on one of the security guards. Eventually, the baby was recovered and taken by nurses to a secured area. The baby's face was red on her nose, forehead, and cheek. The guards had to force defendant to the floor.

{¶ 26} The agency obtained a telephonic order of removal based on defendant's erratic behavior and attempt to remove N.C.H. from the hospital against medical advice.

{¶ 27} With respect to the charges involved in CR-519602, it was determined that N.C.H. was gaining weight when fed properly. The wrist injury occurred approximately 7 to 10 days prior to N.C.H.'s admission to the hospital. Upon further examination, other injuries were discovered that pre-dated N.C.H.'s admission to the hospital and included a subdural hemotoma.

{¶ 28} The pediatric neurosurgeon testified that after N.C.H. was admitted for failure to thrive, the hospital took an x-ray to evaluate for rickets. That x-ray revealed a fractured wrist, which prompted further evaluation for inflicted trauma. Imaging studies of N.C.H.'s head, taken on November 26, 2008, showed she had abnormal fluid collections over the brain. Between the time N.C.H had been admitted and when the neurosurgeon saw her, the baby's head circumference had increased markedly, which is indicative of pressure. The infant required surgery to relieve the pressure on her skull. The neurosurgeon concluded that the injury was "some assault to the baby that was not a natural accident." The type of subdural hematoma present in N.C.H. takes a significant amount of force to inflict, such as violent shaking or slamming the child's head against the wall. According to the doctor, the injury could not have resulted from an accidental drop or fall. The doctor was unable to tell whether N.C.H. will suffer permanent developmental delays as a result of the injury. N.C.H. has also developed

seizures. N.C.H. also had retinal hemorrhages that can be present from immediately after the injury and last for about two weeks.

{¶ 29} The doctor opined that N.C.H.'s injuries could have been inflicted during a time frame somewhere between three days up to a few weeks prior. The doctor did not know where the injuries were caused or who caused them but stated that "somebody inflicted this on [N.C.H.]."

{¶ 30} According to the record, defendant was at home with N.C.H. when she was not at day care. Clopton indicated to the social worker that defendant was the primary caregiver of the children due to the fact that Clopton worked full-time and attended school. The social worker was aware that defendant worked from 4 p.m. to 10 p.m. and Clopton worked from 6 a.m. to 3 p.m. Numerous witnesses testified to the fact that N.C.H. was obviously underweight. The parents did not take N.C.H. to medical appointments and missed well visits. The medical professionals testified that N.C.H. gained weight when she was fed properly. Despite the child's fractured wrist, neither parent reported any injury to the child, nor did either parent ever express any concerns about it. At least one medical professional testified that the child most likely would exhibit symptoms as a consequence of the fracture. Similarly, neither parent noticed or reported any symptoms of the child's head injury that was discovered at the hospital.

{¶ 31} A parent clearly has a duty imposed by law to protect his or her

child from abuse and to care for the child's injuries. See *State v. Sammons* (1979), 58 Ohio St.2d 460, 463, 12 O.O.3d 384, 391 N.E.2d 713.

{¶ 32} The standard of review requires that the evidence be viewed in a light most favorable to the state. Applying this standard, the record contains sufficient evidence to withstand defendant's motions for acquittal on the subject counts and this assignment of error is overruled.

Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


JAMES J. SWEENEY, JUDGE

MARY J. BOYLE, P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR